IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

           Plaintiff,               No. S-Mag 06-0021 GGH

     vs.                      CR-S-06-0035 MCE

ERIC MCDAVID,

           Defendant.         ORDER

_____/

*Introduction and Summary*

        Defendants in this action, Eric Mc David, Zachary Jenson, and Lauren Weiner have been charged by complaint with conspiracy (18 U.S.C. § 844(n)) to violate 18 U.S.C. § 844(f)(1) (destruction by explosion or fire of United States real property) and § 844(i) (destruction of a building etc. by explosion or fire when said property was used in interstate commerce).  On January 25, 2006, an indictment was returned against these defendants alleging the same charge with the exception that subsection (f) generally was described in the indictment. The background to the alleged conduct is defendants' actions in concert with, or in sympathy with, the aims of the Earth Liberation Front (ELF), a movement dedicated to destroying property (and at times, people) associated with activities at odds with the ELF's ideas of what is good for the environment.

All defendants have sought release on bail and conditions.  The United States strenuously urges that all defendants be detained as flight risks and dangers to the community if released.  The court finds in this order that defendant Eric McDavid be **detained** as a flight risk and danger to the community.

*Facts Common to All Defendants*

The great weight of evidence thus far, as set forth in the Complaint affidavit and as produced at defendant Weiner's detention hearing, clearly indicates that all three defendants engaged in the aforementioned conspiracy to attempt destruction of one or more proposed targets in the greater Sacramento metropolitan area and/or El Dorado County.  According to the complaint, the three defendants and an undercover, paid FBI source rendezvoused in a residence in Dutch Flat located in Placer County.  Unbeknownst to the defendants, the house obtained by the informant and the informant were wired to record their conversations.  These conversations included debates on the "best" target, a statement from defendant McDavid that "human casualties would be acceptable," discussions on how to create explosive devices, and how defendants planned to go underground after completion of their criminal deeds.  Defendants also engaged in preparatory activities (along with the sometimes facilitation by the informant) with the view of accomplishing their destructive aims such as reconnaissance of at least two potential targets, acquisition of bomb making "recipes," and purchase of materials with which to make explosive devices.  All three defendants actually initiated a cooking of bleach in order to commence bomb making activities.

While this group of defendants may not have possessed a polished expertise in explosives and their use in blowing up targets, there is no doubt from the evidence presented thus far that defendants were deadly serious in their intent to wreak destruction on some type of target which they believed would make a statement in favor of their anti-government, anti-corporate, allegedly pro-environment cause.  It is also apparent, that regardless of expertise, defendants, if not stopped, would have set off some type of explosive device with the risk to human life

2

1   possible, but which risk is quantitatively unascertainable at this point.

2            The government also spent some time at Weiner's detention hearing in attempting

3   to link defendants to primarily the ELF, and also the ALF (Animal Liberation Front).  These

4   organizations were characterized by the government's expert as leaderless, for the most part

5   structureless, "movements" comprised of individual, autonomous cells.  The cells kept in loose

6   contact with each other via websites, and gatherings at protest sites.  These cells shared some

7   common goals, e.g., throwing off government control, anti-corporate philosophy, "protecting"

8   the environment and non-human organisms/creatures within the environment, but the overall

9   organization apparently has no constitution, bylaws or rigid, binding dogma.  Members of cell

10  groups may support members of other groups out of supposed common purpose.  However, other

11  than statement(s) by McDavid that the groups criminal actions should be attributed to ELF, no

12  evidence directly linking defendants to this movement was produced.  Nevertheless, the aims of

13  these defendants relate in a general fashion to the testified about aims of the ELF.

14            The government did produce evidence at the <u>Weiner</u> hearing that defendants were

15  visited in jail by members of some type of support group perhaps affiliated (in a very loose way)

16  with the ELF movement.  Evidence of criminal intent by this group in terms of aiding some type

17  of absconding if released was not thus far produced, but it is curious that members of what will

18  be termed a "support group" were instantly aware of defendants' incarceration, and nearly

19  instantaneously visiting defendants.

20  *Facts Regarding Defendant McDavid*

21            Defendant McDavid is different in degree from his co-defendants.  If the group of

22  co-defendants had a leader or director or mentor, McDavid was that person.  He was also

23  significantly older than his co-defendants.  Unlike the other defendants, McDavid also made

24  statements indicating his desire to cause human death or injury.

25            Unlike the other defendants, McDavid does not appear to have a webpage

26  detailing his travels, thoughts and the like.  However, the complaint affidavit in this case

describes McDavid at some length.  McDavid is alleged to maintain no permanent residence, although McDavid has related to Pretrial Service that he considers his parents' residence in Forest Hill, CA to be his home.  McDavid has traveled quite a bit in the same fashion of his co-defendants, i.e., essentially living off the land, hopping trains, sleeping outdoors, and has attended seminars or protests concerning environmental matters.  McDavid is an associate of a convicted eco-terrorist, Ryan Lewis.  On one of his travels, McDavid conversed with the informant in this case in Philadelphia, PA, and according to the informant, McDavid offered training on how to construct and use Molotov Cocktails.  McDavid expressed his desire to kill a person in law enforcement, and told of his regret that he had not been involved in a protest altercation which led to a police officer's death.  While associating with the informant in Bloomington, IN, McDavid stated that he had plans to construct explosive devices in order to damage various governmental and commercial facilities.  He specifically told the informant that he would kill the CS if his plans were disclosed by the informant.

It was at the August 2005 Philadelphia convergence that McDavid met with defendants Weiner and Jenson, whereupon he invited them to participate in a bombing campaign in California during the winter of 2005-2006.  The recorded surveillance of the trio and the informant which took place at the rented residence in Dutch Flat, CA (Govt. Exhibit 7) demonstrate that McDavid was the leader of the group in its plans to bomb targets such as a USFS facility in Placerville, CA, or at the very least, a first among equals.  McDavid appeared to direct many of the conversations and activities undertaken by the group.  For example:

(1)  January 10, 2006 (page 137): McDavid stated, we need to get sport bottles.  Weiner stated, we can dumpster dive for them.  McDavid stated, he needs a particular kind.  Also stated more potassium chloride means bigger bang.

(2)  Id. at 138: McDavid discusses testing the potassium chloride in the cabin area.  He does not want to transport explosives in vehicle.  McDavid says boiling bleach is unhealthy.  Prefers to be outdoors.  Tomorrow night there (sic) going to find a location for testing.

4

1        (3) Id. at 143: McDavid mentions something about a fuse.  References potassium

2   chloride, [and then references a list of things that will be required for an explosive device].

3   McDavid says you can make it into a paste.  It takes an hour to dry.  Vibrations can set it off.

4        (4)  January 12, 2006 (page 153): McDavid discusses how to make crystals and is

5   reading material on explosives.  McDavid says that after the test they will decide what type of

6   device is best for each type of target.

7        Although McDavid stated on January 12, 2006, that "he's not running the show,"

8   and he can be persuaded about other ideas, the overall impression is that the co-defendants were

9   looking to McDavid for leadership and instructions.

10       On a body recording not yet transcribed, McDavid is reported by the informant as

11  saying that "human casualties would be acceptable" during their bombing events.  The overall

12  evidence indicated that McDavid was more heavily committed to the criminal goals of eco-terror

13  groups.  From what the undersigned has observed of  McDavid in court, he appeared much less

14  taken aback by his present status than the other defendants, i.e., he is more hardened.

15       The defense presented little in the way of evidence to rebut the government's

16  presentation and exhibits.  McDavid's attorney proffered that McDavid was closer to his family

17  than the government thought; this was buttressed by the fact that McDavid's parents were willing

18  to post their apparently one most significant asset as security for any bond.  Specifically,

19  McDavid's father confirmed that the family would post its residence on 20 acres (available

20  equity at or about $400,000).  His father related that he would use stock investments to pay for

21  his son's legal defense.  Somewhat inconsistently, McDavid asserted that the Forest Hill home

22  was his primary home, but that he last resided with his parents approximately two or three years

23  ago.

24       McDavid has no significant employment in the recent past, and has very little in

25  the way of assets.

26       Like the other defendants, McDavid does not have a criminal record.

1  *Analysis*

2    Release on conditions is the general rule, and not the exception:

3    The Bail Reform Act of 1984, 18 U.S.C. §§ 3141, et seq., requires
     the release of a person facing trial under the least restrictive
4    condition or combination of conditions that will reasonably assure
     the appearance of the person as required and the safety of the
5    community. 18 U.S.C. § 3142(c)(2); United States v. Motamedi,
     767 F.2d 1403, 1405 (9th Cir.1985).  Only in rare circumstances
6    should release be denied, and doubts regarding the propriety of
     release should be resolved in the defendant's favor.  Motamedi,
7    767 F.2d at 1405. On a motion for pretrial detention, the
     government bears the burden of showing by a preponderance of the
8    evidence that the defendant poses a flight risk, and by clear and
     convincing evidence that the defendant poses a danger to the
9    community. Id. at 1406-07.

10  U.S. v. Gebro,  948 F.2d 1118, 1121 (9th Cir. 1991).

11    However, within that general rule Congress has set forth certain crimes for which

12  the accused is presumed to be a flight risk and danger to the community, and hence ineligible for

13  bail in the absence of countervailing evidence.  All agreed that the charged offense set forth

14  above is a presumptive offense for detention purposes.  See 18 U.S.C. 3142 (e) referring to an

15  offense listed in 2332b(g)(5)(B) of Title 18 which in turn references 18 U.S.C. 844(i), one of the

16  object offenses of the conspiracy (§ 844n).[1]  As a presumptive offense, in the absence of rebuttal

17  evidence, the court shall presume "that no condition or combination of conditions will reasonably

18  assure the appearance of the person as required and the safety of the community." § 3142(e).  The

19  presumption is, of course, subject to rebuttal by the defendant, but the presumption remains as an

20  evidentiary factor dependent upon all the facts and circumstances of a particular case and

21

22 _____

23    [1]  Although 18 U.S.C. § 844(n) is not itself listed within § 2332b(g)(5)(B), the terms of
     that section, which impose the same penalties as those specific sections which are the aim of the
     conspiracy, are sufficient to treat a conspiracy to commit a presumptive detention offense as
24   commission of the listed offense itself.  Any other interpretation would lead to the absurd result
     that simply because one was caught prior to the actual commission of a planned offense, that
25   person would not be considered as dangerous as the person who by luck or lack of informant
     participation  was able to complete the offense prior to his arrest.  Such illogic is not compelled
26   by a reading of the aforementioned statutes.

                                      6

defendant.  United States v. Jessup, 757 F.2d 378, 380-382 (1st Cir. 1985) (Breyer, J.)[2]   The

burden of proof remains with the government by clear and convincing evidence (danger to the

community) and a preponderance (flight risk).  Id.  The specific factors set forth in § 3142(g) by

Congress to be considered in addition to any presumption (which may be positive or negative for

detention purposes) include the nature and circumstances of the offense, especially its violent

aspects, the weight of the evidence (related by the Ninth Circuit to be the least important factor,

see United States v. Windsor, 785 F.2d 755, 757(9th Cir. 1986)), details related to the person

including: past conduct, criminal history, drug usage, ties to the community, whether the person

was in court proceedings or on court imposed supervision when the crime was committed, and

the nature and seriousness of the danger *to any person or the community that would be posed by

the person's release*. (Emphasis added).   The bail statute does not require a guarantee of safety

to the community – only that conditions of release can "reasonably assure" the safety of the

community or any person within it. § 3142(e), (g).  Detention for alleged terroristic crimes is not

*de jure* or *de facto* automatic, and courts must analyze each defendant's background and

circumstances independently.  See United States v. Al Arian, 280 F. Supp. 2d 1345 (M.D. Fla.

2003) determining that some defendants, allegedly belonging to the Palestinian Islamic Jihad,

and in a case whose perspective encompassed multiple human killings, could be released.

　　　　　While bail may not simply be set in a pre-determined amount which the court

understands that a defendant cannot meet, § 3142(c)(2), the absence of substantial resources

necessary to provide a deterrent effect may be considered in the bail equation, and may be

significant in determining pretrial detention if a financial condition is a necessary component of

\\\\\

\\\\\

\\\\\

---

[2]  Dicta in Jessup on an entirely different issue (standard of review) was abrogated in United States v. O'Brien, 895 F.2d 810 (1st Cir. 1990).

1  reasonable assurance of non-flight and safety.  United States v. Fidler, 419 F.3d 1026, 1028 (9th

2  Cir. 2005).[3]

3         Finally, the Ninth, First, Second, Fifth, Seventh and Tenth Circuits have expressly

4  approved a bond whose security for compliance with conditions may attach to *any* condition of

5  pretrial release.  That is, the security for appearance may be forfeited upon any material breach of

6  any condition of pretrial release.  See United States v. Gigante, 85 F.3d 83, 85(2nd Cir. 1996)

7  citing, among other cases United States v. Vaccaro, 51 F.3d 189, 191-92 (9th Cir. 1995).

8         Turning to an application of the facts in this case to the law, the undersigned has

9  determined that detention is appropriate in this case.

10         First, the court applies the presumption that Congress has required – that

11  McDavid would be a danger to the community if released, and also a flight risk.  The government

12  adds *significant* weight to that presumption by introducing evidence that McDavid was not at all

13  reticent about taking human life.  Also, as noted above, McDavid was the senior member of this

14  group, and was essentially directing its activities.  Thus, the nature of the alleged crime, the

15

16         [3] Fidler explained: "If the district court orders that the defendant be released subject to
conditions, the statute specifically prohibits the court from 'impos[ing] a financial condition that
results in the pretrial detention of the [defendant].' 18 U.S.C. § 3142(c)(2).  This provision was

17  intended to prevent the practice of "de facto preventative detention," where a judge could in
effect issue a detention order without a proper finding of risk of flight or danger to the

18  community by granting bail but setting an exorbitant financial condition that the defendant could
not meet.  United States v. Westbrook, 780 F.2d 1185, 1187 n. 3 (5th Cir.1986).  Several other

19  circuits have addressed the apparent violation of § 3142(c)(2) that arises when, as in Fidler's
case, a defendant is granted pretrial bail, but is unable to comply with a financial condition,

20  resulting in his detention.  It may appear that detention in such circumstances always contravenes
the statute.  We agree, however, with our sister circuits that have concluded that this is not so.

21  See Westbrook, 780 F.2d at 1188-89; United States v. McConnell, 842 F.2d 105, 108-09 (5th
Cir.1988); United States v. Szott, 768 F.2d 159, 160 (7th Cir.1985) (per curiam); United States v.

22  Wong-Alvarez, 779 F.2d 583, 585 (11th Cir.1985) (per curiam); United States v. Jessup, 757
F.2d 378, 388-89 (1st Cir.1985), abrogated on other grounds by United States v. O'Brien, 895

23  F.2d 810 (1st Cir.1990).  These cases establish that the de facto detention of a defendant under
these circumstances does not violate § 3142(c)(2) if the record shows that the detention is not

24  based solely on the defendant's inability to meet the financial condition, but rather on the district
court's determination that the amount of the bond is necessary to reasonably assure the

25  defendant's attendance at trial or the safety of the community.  This is because, under those
circumstances, the defendant's detention is 'not because he cannot raise the money, but because

26  without the money, the risk of flight [or danger to others] is too great.' Jessup, 757 F.2d at 389."

1  presumption for detention, and the expressed, violent intent, greatly weighs against any type of

2  release.

3         The government adds to its side of the ledger with consideration of the weight of

4  the evidence.  Audio recordings of the defendant himself fully support the indictment/complaint

5  allegations in this case, and essentially establish the case.  The court is not impressed at this

6  juncture with hints that the defense may attempt an entrapment defense, as such would seem

7  doubtful given the nature of the law of entrapment.[4]

8         Unlike Jenson, McDavid has a family with a significant asset to post, the loss of

9  which would appear to inflict a sting or hurt on the family.  However, McDavid's itinerant

10  absence from his family over the recent past detracts from the deterrent value of the bond.  See

11  United States v. Koenig, 912 F.2d 1190, 1193 (9th Cir. 1990) ("His parents have offered to put

12  up a bond, but there is reason to believe that his relationship with his parents is not a close one

13  and that the bond would not assure his appearance").  Moreover, McDavid appears much more

14  skilled in underground activities than his co-defendants, e.g., "McDavid discusses about

15  immigrant smuggling.  The guy who suggested it is from Kingman, Arizona.  The guy's name is

16  Emmers and he met him while hitchhiking.  If you ever need a job its two thousand dollars a

17  ─────────────────

18  [4]  "When entrapment is properly raised, the trier of fact must answer two related
questions: First, did government agents induce the defendant to commit the crime? And, second,
was the defendant predisposed? We discuss inducement at greater length below, see page 698
19  infra, but at bottom the government induces a crime when it creates a special incentive for the
defendant to commit the crime.  This incentive can consist of anything that materially alters the
20  balance of risks and rewards bearing on defendant's decision whether to commit the offense, so
as to increase the likelihood that he will engage in the particular criminal conduct.  Even if the
21  government induces the crime, however, defendant can still be convicted if the trier of fact
determines that he was predisposed to commit the offense.  Predisposition, which we also discuss
22  at length below, see page 703 infra, is the defendant's willingness to commit the offense prior to
being contacted by government agents, coupled with the wherewithal to do so.  See United States
23  v. Hollingsworth, 27 F.3d 1196, 1200 (7th Cir.1994) (en banc).  While our cases treat
inducement and predisposition as separate inquiries, see, e.g., United States v. McClelland, 72
24  F.3d 717, 722 (9th Cir.1995), the two are obviously related: If a defendant is predisposed to
commit the offense, he will require little or no inducement to do so; conversely, if the
25  government must work hard to induce a defendant to commit the offense, it is far less likely that
he was predisposed. See Hollingsworth, 27 F.3d at 1200."
26  U.S. v. Poehlman,  217 F.3d 692, 697, 698 (9th Cir. 2000)

1   head." Govt. Exhibit 7 at 139.  McDavid would have no difficulty in sliding back into the

2   underground.

3              In sum, the court does not believe the proffered bond would adequately protect the

4   safety of the community or defendant McDavid's appearance.  His desire to inflict harm on

5   humans, his heavy commitment to the criminal goals of eco-terror groups, and his greater

6   knowledge of underground survival skills greatly outweigh the evidence presented by the defense

7   to suggest that McDavid would not cause harm to the community and remain to face the charges.

8   The court believes it quite possible that McDavid would consider forfeiture of his parent's

9   residence as a necessary result for the cause.  The government has met its burden of proof in both

10  danger and flight risk respects.

11  _Conclusion_

12             Defendant McDavid is ordered **detained**. [5]

13  DATED: 1/26/06

                                          /s/ Gregory G. Hollows
14                                    _____
15                                          GREGORY G. HOLLOWS
                                          UNITED STATES MAGISTRATE JUDGE
16  GGH:gh:035
    mcdavid35.ord

17

18

19

20

21

22

23

24

25  ────────────────────────

26      [5]  In fairness to McDavid, the undersigned has not relied on the ELF testimony on the jail
    visits testified to in the Weiner hearing.